Thank you. Please be seated. All right. Welcome, everybody. I'm guessing that y'all have been here before and you know the rules, but I just want to remind you of the timing. When it becomes yellow, you have two more minutes. When it becomes red, you are done unless we are still asking questions, in which case you can't run out. We can ask the questions and you need to answer them, but if we're done asking questions, you need to finish up your sentence and stop. So with that, we'll go ahead and get started. Our first case is 24-60420, Florida Gas Transmission v. United States Department of Transportation, and we'll start with Dana Livingston for the Florida Gas Transmission. May it please the Court. There are two main issues in this case. The first is what do the regulations require for an operator to validly establish maximum allowable operating pressure, or MAOP, under 619A3 or 619C, both looking at the highest actual operating pressure in the five years before the pipeline safety regulations went into effect in July 1970. The second concerns tool selection and asks whether the regulations require an operator to run tools to identify threats or whether the regulations allow or require a threat identification process-based analysis to determine whether the pipeline is susceptible to a particular threat, and then run the tools to assess the identified threats. I'll leave the other issues to the brief, unless, of course, the Court has questions on those. So I wanted to go ahead and turn . . . Well, I guess one question I'm asking that's kind of round is this was a pretty bad event and you don't think your client should have to pay anything for having been the reason for a huge problem on the pipeline? So the violations here don't actually relate, the noticed violations don't actually relate to what caused the pipeline to rupture. And so just because there is a rupture doesn't mean that there's a violation. This Court, you know, made that common sense observation in the ExxonMobil decision. And so it's not a matter of we don't think we should pay something because there was a rupture. We have to go by the violations that were in the notice of probable violation, that's the charging instrument that PHMSA uses, and look at whether those violations are supported by the record. So I wanted to turn to that first one, the MAOP establishment. And I wanted to, at the The question here is not really whether FGT, Florida Gas, failed to keep records, but whether in the absence of certain records, we never validly established MAOP at all. That's the agency's theory. They could have charged us, according to a footnote in the final order, with a recordkeeping violation. That probably gets into a retroactivity fight about that recordkeeping violation provision that they cited in the final order. But what they did was instead they reframed the question about whether we validly established it at all. And so I think the problem here is that the violation that's noticed isn't supported by the regulation's plain text and ends up having the agency at war with its own regulations. And I want to point out a couple things on this that I think are important just when you stand back and look at the issues. The first thing is the regulations don't actually require a particular form of a record for pre-1970 pipelines. That's pre-Part 192 pipelines. That's still true today, whether you're applying one of the recordkeeping provisions that's currently in the regs or not. It still doesn't require a particular form of a record. The other thing that I want to point out is I think that, you know, we had records here. The gold sheet, for example, and we've put it in the Reply Brief, just screen-capped it in there. It's also in the record excerpts. In the past— Another one. I guess I'm just kind of not understanding why your client doesn't have more in the way of records on that. Isn't it important to try to keep the pipeline going and not having these issues of 22 million cubic feet of natural gas occurring and so on? Yeah, absolutely it's important. And we live by the regulations. We try to comply with the regulations. And in part, we're like, tell us what's actually required and tell us to the level of ascertainable certainty, which is what, you know, the fair notice jurisprudence requires. What kind of records are you requiring? Their complaint, PHMSA's complaint, seems to be that we didn't have these original data. We didn't have these pressure gauge readings. We didn't have all this stuff back from decades ago. There's no requirement in the regulations, once you've validly established MAOP, to continually—unless there's a class change location or something else that would require you to reestablish— What should the DOT do to try to avoid these kinds of things that they haven't done? They could be very clear in the regulations about precisely what it is that they expect in terms of operating records. And you may have seen the 28J letter and the government's response that we filed last week, and that's focused somewhat on the recordkeeping, you know, sections, but it reflects this overall policy that PHMSA is saying, hey, we're not trying to apply those retroactively. And at the very end, if you look at the interpretive text that's in—that PHMSA published in the Federal Register that we cited to in the 28J, that July 2025 direct final rule, at the very end of it, it says that PHMSA apparently intends to provide more guidance about what exactly is required, and they haven't done so yet. And so that leaves us as an entity that tries to comply with the regulations at a little bit of a loss. So if you think about what do we do, we go back to that Enron gold sheet, and they looked at everything back in 1989 to try to record all of that information. There's no requirement in the regulations, once you've validly established it, to continually redo that whole process on a continuous basis. So as a regulated entity, if you have a document that documents what your MAOP was established to be, why would you just continually go back and, you know, redo that all the time if there's not some reason like a class location change, right? A higher density population, for example. An entire neighborhood gets built, and it's a little closer to the pipeline, so the class—it's like a screening classification, right? The higher the screening classification, the higher the consequence here. They're class locations, but they're Roman I through IV. So, you know, your theory is that they're changing the goalposts, essentially. Say again? Your theory is essentially that they're changing goalposts. They are. They were accepted. These gold sheet type things were—they're used all over, not just the Sanford lateral. Right, right, right. I want to clarify something you said earlier because it confused me. You mentioned the lack of historical records in terms of the operating pressure issue. I thought your theory was that the historical evidence was enough, not that—I think I may have misunderstood what you were saying. It is. The historical evidence here is enough. I think our record—we stand on the gold sheet. There are other records. That's not the only thing that we provided, of course. We do stand on that. There is an additional problem, though, with what PHMSA is their position about it. It does start to tread into looking like it's a retroactive application of some standard that came into the regulations in 2020. That's subsection F? That's subsection F. Your theory is essentially that there was no contemporary recordkeeping requirement in the regs prior to subsection F. Right. There's a companion. Subsection F came in also with the reconfirmation that's in 624, but the subsection F under 619, that recordkeeping requirement, it was a companion with the reconfirmation process. And that reconfirmation was, you know, where they introduced the idea of traceable, verifiable, and complete records. TVC is what they call them. But let me just point out that we had not just the gold sheet. We had a whole packet of documents. It's about 650 pages that's in the record here. It's in the appellate record as well of documents. We had over 100 pages of testimony in it. And I want, if you look at anything really out of the appendix, big appendix in this case, let me direct you to a few pages. It's about a 10-page range. Five of them are slip sheets in between the items in the appendix. But it starts at appendix 1585. It goes for 10 pages, so stops at 1594. And I'm focused on these documents because FEMSA, the government says, listen, the West Texas gas case, we wouldn't look at some record they offered us because it wasn't from the magic time period, that five years between July of 1965 and July of 1970. That first document that starts on page 1586 of the appendix is a document within that time period. It's six months before the end of that time period. And if you look at that document and the others that follow in that range, what you're going to see is that this, there was actually evidence of the historical, sorry, the highest actual operating pressure. Let me just spend a minute talking about that. That first document has four operating pressures. Before you get to that, can I just ask sort of a broad question? I fully understand your argument that it's about what the law required at the time. So I get that. I'm just asking sort of a broader question. Do you acknowledge that as a pure policy matter, it would be better to have the modern data just from the standpoint that I assume pipelines degrade over time and so the historical evidence could be obsolete? Do you sort of acknowledge that and just simply say that wasn't the law? Or do you actually contest that as well? The historical evidence might be obsolete. It depends on if it's, if there have been changes on the pipeline or not. But as a policy matter for a regulator trying to regulate, you know, operators, then yeah, the more data, the better. That's a policy choice by PHMSA. But they need to have it in the report. You're right. No, I get your point. Your point is you have to update the law then if that's the issue. But I was just curious if you actually had an argument that the modern data isn't helpful. And it sounds like you don't. But that's fine. Yeah, it's a lot of data. But again, that's a policy decision by PHMSA.   Fair enough. That's not my position there. But let me just point out this document from January of 1970. It's got four pressures on it, one in the 900s, one in the 800s, two in the 700s. And in the documents that follow in that 10-page range, what you're going to see is Florida Gas spending money to upgrade to get rid of the lowest 700 number. And that number, by the way, shows up on the Enron Gold Sheet. They also spend money to retest portions of the Sanford Lateral to get rid of the other lowest 700 number because they want to operate at either the number in the 900s or the 800s. And then they spend money to put in a regulator. That 900 number, by the way, that's the pressure coming in from the main line into the Sanford Lateral. But they spend money to put in a pressure regulator to make sure it's operating in the 800s. There is no way to read those four documents or the five documents in that 10-page range and come to the conclusion that Florida Gas was spending all this money to do all of these other things just because somehow it was operating down at 713. It wasn't. And so when you take that back to the A1 through 4 and you're looking at the lowest number, it wouldn't be the lowest. So 619C allows us to use that number for the grandfather provision. Counsel, can you help me with the dates? Tell me again? Can you help me with the dates? The dates on the documents? Yes. Yeah, I'm confused. So it looks like this says class location January 71. Right. That's the first page. Right. It's a study in advance of the Part 192 going into effect because Part 192 was going to have these class locations, right, 1 through 3. There was no evidence that Sanford Laterals ever had a class 4. So they were looking, what's the impact of this? And then there were going to be compliance deadlines, which ultimately got moved out. And so that's what that document was. It was a planning document. But it was created, actually, at the top you'll see it was created January 21 of 1970. So it's in, it's six months before the end of that five-year period. And I'm supposed to read, so none of those numbers at the bottom is 713 PSIG, which is the There is one. Are you looking at the one that has the red handwriting on it? There's a little scratch out of it. Oh, I do see it. And then they say upgraded the pipe. Yeah, there's one 713. There's a 713. And if you want to know where those operating pressure numbers come from, if you look at the 1975 documents, one is at Appendix 1592, and then there's a slight correction to it two pages later. Up in the upper left-hand corner, there's sort of a little answer key, if you will. And you'll see all those numbers in there. It depends on the class location, but also the diameter, the wall thickness, the grade of pipe, whether it's grade B or it's X42. But the page ranges that you gave us from 1585 to 1595 1594. 94, excuse me. These are all after 1970, right? So 1973, 1974. The first one. The others, though, help explain the context for that very first document. The first document that is within the five-year period. And your position is the agency should have inferred from these numbers that are at the bottom of each one of the Roman numeral segments that those were the actual operating pressures in January of 1970? If you look at the following documents, why is Florida Gas spending all this money to do all these things like upgrading the pipe that's in the ground to get rid of the 713, running a partial pressure test in 1974, and that's going to be the document at 1590, so that it can operate up at 866 instead of the 722 number that you get there? It's sort of a follow-the-money type of theory. Why are they doing that? And again, the gas is coming in off the main line up at 975. And then they're putting in a pressure regulator at 866. That all shows that it's not at 713, but it's operating up higher. Okay. Thank you. Thank you, Judy. You've saved time for rebuttal. All right. And now we move to Brian Springer for the Department of Transportation. Good morning, Your Honors, and may it please the Court. Brian Springer on behalf of the federal government. I think it's important just to take a step back and clarify what's actually at dispute in this case. Florida Gas doesn't challenge the agency's authority to issue the regulations implicated in this case, nor does Florida Gas contend that the regulations are invalid on some other basis. Instead, the central dispute is about the application of the regulations to Florida Gas's specific conduct. And that's a question of substantial evidence, as I think the discussion this morning has showed. I'd like to walk the Court through the administrative record as to, you know, each of the violations that the agency found in this case. I think the one that got the most play this morning and was discussed the most is that Florida Gas failed to substantiate the maximum pressure at which its pipeline could safely be operated. And again, in the course of the proceedings before the agency, Florida Gas relied almost exclusively on what they call the Enron Gold Sheet. And the agency looked at that document and determined, based on its analysis of the document and the testimony that was in the record, that that document did not show a highest actual operating pressure for the pipeline. What's your response to her basic argument that y'all just didn't put out enough policies and so it's your problem, not theirs? Your Honor, I just don't think that's the right way to read the regulations and understand the way they've been understood for years. What the regulations say is that an operator can't operate their pipeline above the lowest of four pressures. Here, the pressure that we're talking about is the highest actual operating pressure. And that's the same thing that appears in Subsection C. So under either subsection, the question is whether Florida Gas has demonstrated an actual operating pressure between the relevant period, which is from July 1965 to July 1970. And that's exactly the question that the agency assessed in the administrative proceeding and determined that Florida Gas had not validly established that, had that figure to establish that pressure, to make sure that Florida Gas was not operating above the limit that appears in these regulations. Your Honor, I'm also happy to talk about the tool selection question, unless there are other questions specifically about the first item violation. So your basic argument is that the gold sheet just wasn't odd enough, and so they should just pay the, what is it, $46,000? Your Honor, that's correct. The primary document they were relying on was this Enron gold sheet, which the agency looked at. It doesn't say anything about actual operating pressure. It was created well after the relevant period, and Florida Gas didn't submit any other records or documentation to show what the actual operating pressure was during the relevant period. The other things that they're pointing to are things like pressure tests, and pressure tests are not the same thing as an actual operating pressure. They can't rely on those as the basis to establish what the actual operating pressure was during the relevant historical window. But again, I'm focusing more on the, you know, pipeline issue. How did this affect that? Your Honor, the whole... Give us your best answer on that. I know you all have talked about it, but what's your best answer? Your Honor, the whole point of these provisions is to provide for pipeline safety and make sure that pipeline operators don't operate their pipeline at a pressure that's unsafe, that's too high. And so what these regulations are designed to do is to have the operators figure out what the limit is and how high they're allowed to operate their pipeline so that if they go above that, there could be an explosion. You know, the pipes can tear open at the seam. And we had an incident in this case. The agency didn't determine that it was specifically connected to this, you know, establishment of the maximum allowable operating pressure, but this protects against those sorts of things. And the agency took that into consideration in determining what the appropriate penalty was for this particular violation. Okay, well, the bigger penalty was Item 3, so we'll let you talk about that, unless my colleagues have questions on Item 1. Before we move off of Item 1, briefly... Go ahead, please. How could you have a grandfathered MAOP without establishing the actual operating maximum allowable operating pressure? Does that make sense? Like, how could you have a 619C grandfathered MAOP without knowing what the actual operating pressure was during the grandfather period? I mean, I think in general, the way that... I think there are multiple parts of Subsection C, but the part we're talking about, it's required that you have an actual operating pressure, and usually what is happening, is my understanding, is that, you know, these... Again, maybe sort of as the backup point, these regulations came into effect in 1970, and the Grandfather Clause in particular was supposed to benefit pipeline operators. The idea was, if you can come in and say, look, I've been operating my pipeline at this level, you know, in the past five years, you could continue to operate it at that level so long as it met the other requirements in C. And here, that's exactly the thing that's missing, is we don't have the information. The agency reasonably determined that we don't have the information of what level this pipeline was operating at from July 1965, you know, at any point between July 1965 and July 1970. So it strikes me that... And I don't mean to be overly simplistic, but let's try to impose some analytical clarity on the gold sheet for a second. I can think of three possible ways to understand the tick mark that's on the 619C box. One is what they say, which is that shows you that during the relevant Grandfather Clause period, the actual operating pressure was 713 PSIG. That's one inference that you could draw from that. And it therefore qualified and satisfied the Grandfather Clause on the date of the regulations and should therefore continue to apply throughout the relevant period. That's one inference. Another is that they're lying. Not them, but Enron, right? They said it was 713, but in fact, they had no basis for that whatsoever, and it was just a bunch of fraud, and we all know about Enron's ultimate demise, and so maybe it was just a lie. And then the third is that maybe they thought it was 713, or they had some reason to believe it was 713, but you and the federal government need more information to substantiate it, right? So it's not that they were just making it up and pulling 713 out of thin air, but we need to know more. I'm assuming that third position is yours, right? That you can't just take their word for it, that between 1965 and 1970, the 619C relevant grandfather provision was 713. Is that fair? Your Honor, I think that's basically right. I mean, I think the high-level point that there are multiple competing inferences that can be drawn from this just shows that the agency could conclude that it doesn't think the 713 number is the right number. That's interesting. And I will say, too, that there was testimony in the record from Florida Gas in particular, and we have this in our brief, that they said it's possible that Enron inadvertently checked the box for this. And so given all of the testimony pointing in different directions, the agency, again, because we're asking a question of substantial evidence, the agency was allowed to determine, and it did based on all of the evidence that it weighed here, that this was not an actual record that showed what the actual operating pressure was during the relevant window. So you're not saying it isn't 713. You're saying you have no idea what it was. That's correct, Your Honor. So I guess what I'm wondering is that the substantial evidence standard since at least 1950 in Universal Camera when Felix Frankfurter gave it to us has said that the agency, in doing substantial evidence, must consider the evidence in its favor and also the evidence that detracts from the agency's position. If the only thing you know, the only piece of evidence that we have from 1965 to 1970 is what they offer you, which is a 619C checked box, it sounds like there's really nothing on the other side of the scale. I'm having a hard time understanding. You might reasonably say, gosh, we wish we had more, but the regulations don't say that there's anything wrong with having one document that says the number was 713 PSIG. And so what is it exactly on your side beyond we don't believe you? Again, I mean, I think it's the testimony that came in during the case where, and in fact, it's Florida Gas' own description of what this document shows. At times, Florida Gas has said that this 713 number is a design pressure which goes to a different subsection. They themselves have said it's not, it might be an actual operating pressure, it might not be. They think that Enron must have done the work here. And so that's why the agency looked at this. And again, the document was created in 1989. This isn't a contemporary record where the agency is saying, okay, we have a specific number from the relevant window, and we're just going to reject it. Instead, we have something that was created much later. We don't have enough information about what the basis was for it. And the agency wants to make sure that operators are not operating their pipelines at levels that exceed kind of a safe level. And that's the reason that here, they concluded reasonably based on the record that they had not established that that was the appropriate, that that was an actual operating pressure for the relevant window. I could do this all day. I think it's fascinating, but we should probably move on. So if you want to do item three or whatever else the court wants to talk about. I'm happy to briefly touch on item three, which I know sort of wasn't discussed kind of in the opening, but just very quickly. Well, it's not brief because it's way more money. So, Your Honor, yeah. What I will say about this violation, so this violation is about the selection of a particular tool to run through the pipeline. And here, we have a series of undisputed facts about the types of issues that this pipe might face. It is subject to, you know, the type of pipe that it is. It's prone to manufacturing defects. It also was the case that Florida Gas in 2014 found an anomaly in the seam on this specific pipe. And Florida Gas, it had failures in the seam, seams that ripped open on pipes that sort of surrounded the Sanford lateral specifically. And based on all of that, the agency looked at the subsection 192.937C1, which says that, you know, that pipeline operators are required to follow an industry standard, which dictates that in these circumstances, you know, when you know that there's some, that your pipeline is prone to these type of seam problems, you're supposed to run a tool. And the tool that you run is a tool that looks for problems along the length of the pipe instead of around the pipe. And what Florida Gas did is it ran the one that looks for things around the pipe instead of on the length of the pipe, despite the fact that there was all this evidence that, you know, there was a problem in the seam. And then, of course, they had the incident where this pipe in particular split apart at the seam. I mean, I'm trying to  this has got a lot of this and that and this and that, but to me, the core is who should pay for this issue? Why should it be them? As opposed to the government. You know, I think the relevant, the reason for that is that, again, there's a boatload of evidence in the record about the things that they knew ahead of time. And the point of this regulation is to have pipeline operators run tools to try to find issues before they turn into a problem. And here, they ran a tool that was not looking for the appropriate type of problem and that is, everyone in this case agrees, there's no dispute that the industry standard, to the extent that, you know, this was an issue to which its pipeline was prone, that they were supposed to run a different tool than what they ran and had they run the other tool, it was more likely they would have caught this issue before it turned into a problem. And so, do you feel like your rules are clear on that? That when you, when they cause the problem, as opposed to like a hurricane or something causing a problem, they caused it, then they should pay. Have you made that clear? Because to me, there's just so much about so many other things, I'm just wanting to kind of cubby into that point. Yeah, Your Honor, I think it's very clear under the particular regulation that the agency cited, which is 937 C1, that what it says is that you're supposed to follow an industry standard, and there's no dispute here that the industry standard says that they were supposed to run a different tool if their pipeline was prone to these kind of issues, and given all of the evidence in the record that their pipeline was prone to these kind of issues, they should have ran the other tool and it would have been more likely that they caught this before it became a problem and before the pipeline. And I just want to clarify, of course, I want to look at all of the issues, I'm not saying that this is the only thing, but I do want to ask that, so that's why I did, but please understand, I am looking at all of the  They said, okay, even if item 3 has something correct about it, it's too high, what would you like to say on that? Your Honor, I think the agency explained in detail how But what do you want to say here? I think in particular, I think the thing that they're focusing on is the part where the agency used the phrase causal factor, and if you look at the sentence where the agency said the phrase causal factor, it goes on to explain what it thought a causal factor was here, and it's the same things I've been reiterating today, which is in particular that this type of pipe was prone to this type of issue, and that Florida Gas had seen an anomaly in the seam previously, and that despite all of that, Florida Gas still chose to run a different tool, and that that was what justified the particular penalty in this case. I mean, it's based on an assessment of all the factors that are in the statute and also repeated in the regulations, but I think that's the focus of what is being talked about in the appellate briefs. And what's your best case on that? Your Honor, I mean, again, I think it's just what the agency actually said here, which is it explained... I mean, it very particularly said... I'm talking about cited cases. Your Honor, I don't think that there's sort of a case that's on point about this. It's really just about... I'm asking him. Yeah, I don't think that there's a case... I mean, I guess I would point the Court to the ExxonMobil decision, which says that the question that's being asked here is one of whether or not the agency was arbitrary and capricious in setting this particular standard, so it would have to be that the agency's discussion is unreasonable or unlawful, and here I think that the agency's discussion... And again, the agency very explicitly admitted that it knew that there aren't sort of any certainties here. It may be that if they had run the tool, they wouldn't have caught the problem, but the point was that they were supposed to do that to try to catch the problem so that they could try to prevent it from turning into an incident like the one that we had that sort of precipitated this case. Unless there are other questions, we would ask that this Court deny the petition. Thank you. Thank you. We'll hear back from Ms. Livingston. I'll be quick. A quick few points. What I heard my friend from the other side talking about on the tool selection issue was a lot about this low-frequency ERW pipe and its susceptibility to selective seam weld corrosion. But that, in essence, is a per se rule, and that's the kind of thing that same analysis was foreclosed by this Court's decision in Exxon. They try to disavow that they have a per se rule. I think their brief even says that they're taking a nuanced approach. But what it ends up doing is the regulations say one thing, they have a carefully crafted or constructed scheme for risk assessment kind of analysis to be applied in determining whether a particular pipe is susceptible to that kind of corrosion or that kind of threat. And what they're doing here is instead essentially saying it's per se susceptible. And so that ends up causing, I think, a lot of unpredictability, and it ends up being untenable and unworkable. The problem is, we do want to comply with the rules. You've got to tell us what they are. Do you want everybody and all the operators in the industry to buy a special tool and run it on every single inch of LF ERW pipe? If that's what you want, then that's what the rule needs to say. And if you look at the footnotes, especially the discussion in the footnotes in Exxon Mobil, the Court makes the same point there under different sections, but about whether the regulations actually contain a per se rule or do not contain a per se rule, and even suggests that the agency, if they want that, amend it to provide that. And they've not. So, there's that point. The other point I want to make about the 2014 anomaly that was detected, and they keep on relying on, that's not part of the E4 criteria. When you get down to E4, it has to be a seam failure. An anomaly is not a failure. You can look at PHMSA's own glossary online. A failure is a loss of containment. It's a leak or a rupture. It's not a mere anomaly. Judge Haynes, you were asking about, you know, who should pay, the government or Florida Gas? I just want to be clear. These are about civil penalties. It's not about paying to remedy the harm that was caused by the rupture. Florida Gas already has paid for that. That's not what's at issue here. The other thing I wanted to say was that... Well, I realize that, well, I don't know exactly how much did you all pay versus how much the government paid on fixing. Yeah, I don't know that that part is in the record. That's just not the purpose of these penalties. Well, it kind of is because it takes them so much work and the penalty is to address that. Not necessarily fixing, but the work they've had to do to address it. For the agency to come in and inspect. Right, right. So that's why that is... That's a fair point. It isn't just, give me some money, I didn't do anything. No, they did stuff. So that's why I'm asking about that. Should they have to pay for their time or should you have to pay for it? Your client. That's what the penalty scheme's for. I appreciate that point. Another point... What did you want to say on that, though? I just wanted to make it clear that... Yeah, no, and I wasn't trying to say it was just fixing. It was addressing the costs, which includes the time. I appreciate that. I'm sorry if how I asked it made it... Yeah, no, that's fine. That wasn't my point. One problem here we have here is the agency never makes an affirmative case. What happens at the hearing is the agency reads the allegation and the notice of probable violation, the charging instrument, they just read it. And then they turn it over to Florida Gas to make a case. And the agency never puts on an affirmative case at all. So it's a strange way to conduct a hearing. But some of the problems we see flow from here. And I want to say one more thing before I leave the podium, if I could. Why are we fighting on that Item 1, which is a lower amount? Left uncorrected, I would say that that final order has disastrous consequences. The practical effect is that it's going to require pipeline operators to shut down and dig up and to conduct destructive pressure testing on each and every segment of thousands of miles of pipeline across the U.S. You're saying it would be really difficult for them to be able to keep going on the pipeline. They're going to have to do it to bring it in to get a pressure test, which is the agency's answer for stuff. And that's going to cause massive service disruptions to the energy grid and obviously a lot of costs. So you're saying it's not the money, it's the problem. That's right, that's right. That's why you all are here? Correct. Correct. Any other questions, y'all? Okay. Thank you. We appreciate both sides on this and the case is now under submission to this panel.